IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NOS. WR-53,613-08 & WR-53,613-09






EX PARTE LARRY RAY SWEARINGEN, Applicant








ON APPLICATION FOR WRIT OF HABEAS CORPUS


CAUSE NO. 99-11-06435-CR FROM THE 9TH DISTRICT COURT


MONTGOMERY COUNTY






 Cochran, J., filed a concurring statement.



 Applicant files last-minute, but facially appealing, claims (1) of actual innocence of this
capital murder based upon (1) affidavits from three medical examiner pathologists that the
murder victim must have died within a day or two of December 30, 1998, which was some
twenty days after applicant had been arrested and continuously jailed; and (2) specks of blood
found under the victim's fingernails that contain DNA that does not match that of applicant. 
These claims are not new. This is applicant's eighth writ application and most of this
evidence has been previously considered and rejected by Texas courts. More importantly,
this is an instance of focusing solely on a couple of twigs of apparently exculpatory evidence
instead of the veritable forest of inculpatory evidence. 

 To assess applicant's latest claims, one must weigh their merits relative to all of the
other evidence in this case. In his fourth writ application, filed two days before his scheduled
execution on January 24, 2007, applicant contended that Melissa Trotter's body could not
have been placed in the Sam Houston National Forest on December 8, 1998, because
entomological activity did not begin on her body until December 17th or 18th. He provided
expert affidavits to this effect. We granted applicant a stay of execution and remanded his
writ to the trial court to consider whether applicant could, in fact, establish that Melissa either
did not die or was not transported to the Sam Houston National Forest until December 17th
or 18th, at which time applicant was already in jail and therefore could not have committed
the murder. 

 The trial judge granted applicant additional expert funding and an evidentiary hearing
was held in July, 2007. At some point, applicant filed affidavits from two medical examiner
pathologists, Dr. Glenn M. Larkin and Dr. Lloyd White. Both of these affidavits were signed
on March 29, 2007, and they attack certain findings of Dr. Joye Carter, the Medical Examiner
of Harris County who had performed Melissa's autopsy on January 3, 1999.

 The trial judge's written factual findings and conclusions of law evaluated and
rejected this evidence, along with other evidence. The trial judge's factual findings from the
fourth writ hearing include the following summary of the trial evidence supporting the
conclusion that applicant murdered Melissa Trotter on December 8, 1998:


 
  On the evening of December 7, 1998, two of Applicant's acquaintances, the
Fosters, witnessed a phone conversation in which Applicant arranged for a
lunch meeting with a girl at a library the following day, and Applicant then
told the Fosters that the girl was Melissa Trotter, a college student from Willis;

  Three witnesses saw Applicant sitting with Melissa in the Montgomery
College library between 11:30 a.m. and 1:30 p.m. on December 8, 1998;

  Melissa's Biology teacher saw Melissa leave the Montgomery College library
with a male shortly after 1:30 p.m.;

  Melissa's car remained in the Montgomery College parking lot following her
disappearance on December 8, 1998;

  At 2:05 p.m. on December 8, 1998, Applicant called Sarah Searle and said that
he was at lunch with a friend;

  Sometime around 3:00 p.m. on December 8, 1998, Applicant's landlord saw
Applicant's truck leaving from behind his home;

  At 3:03 p.m. on December 8, 1998, Applicant placed a cell phone call that
utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent
with Applicant driving from his home to the Sam Houston National Forest;

  Applicant's wife testified that she found their home in disarray on the evening
of December 8, 1998, but none of the Swearingen's property was missing;

  Applicant's wife observed Melissa's cigarettes and lighter in Applicant's home
that evening, and those items were subsequently recovered from Applicant's
home during the investigation;

  Applicant contacted police that evening and reported an alleged burglary of his
home, at which time he falsely claimed to have been out of town from 11:00
a.m. on December 7, 1998, through 7:30 p.m. on December 8, 1998, and also
falsely claimed that someone had stolen his VCR and jet ski;

  There was no sign of any prying mechanism having been used on the door to
Applicant's home, and his jet ski was subsequently found at a repair shop
where Applicant had dropped it off for maintenance prior to Melissa's
disappearance;

  Applicant called an ex-girlfriend on the evening of December 8, 1998, and told
her that he was in trouble and that the police might be after him;

  When the Fosters heard that Melissa Trotter was missing on December 9,
1998, they contacted Applicant, who claimed he did not remember the last
name of the girl with whom he had met the day before;

  When Mrs. Foster then told Applicant that she recalled him saying the last
name "Trotter," and that a girl named Melissa Trotter was now missing, the
phone went dead;

  On December 11, 1998, Applicant told an acquaintance that he anticipated
being arrested by Montgomery County authorities;

  Later in the day on December 11, 1998, after Applicant observed an officer
radio in his truck's license plate number, Applicant sped away and led the
officer on a high speed chase that ended in front of the home of Applicant's
mother and stepfather;

  Applicant was arrested on several outstanding warrants following the high-speed chase, at which time he asked that his hands be placed in front of him
rather than behind because his arm and ribs were sore;

  Following Applicant's arrest, law enforcement authorities observed and
photographed red marks on Applicant's neck, cheek, and back;

  On December 17, 1998, two neighbors of Applicant's mother and stepfather
collected numerous pieces of torn paper from along their street, which turned
out to be Melissa Trotter's class schedule and some health insurance paper
work Melissa's father had given to her;

  Melissa's body was discovered in an area of the Sam Houston National Forest
with which Applicant would have been familiar from previous time spent
there;

  The ligature used to asphyxiate Melissa was a single leg torn from a pair of
panty hose belonging to Applicant's wife, the remainder of which was
recovered from Applicant's home during the investigation;

  The Harris County Chief Medical Examiner testified that during the digestive
process, a person's stomach will usually not empty in less than two hours, and
any food within the stomach at death will remain there;

  The contents of Melissa's stomach at the autopsy, which included what
appeared to be chicken and a french fry-like form of potato, were consistent
with the tater tots she had eaten at Montgomery College shortly before leaving
with Applicant and the Chicken McNuggets she and Applicant had apparently
purchased at the nearby McDonald's on December 8, 1998;

  Based on the state of decomposition of Melissa Trotter's body, including the
presence of fungi that take "several weeks' time" to develop, the Harris
County Chief Medical Examiner estimated Melissa Trotter's death to have
occurred twenty-five days prior to the discovery of her corpse, which is
consistent with December 8, 1998;

  A note that had been given to Melissa by another student on the morning of
December 8, 1998, was found in a pocket of Melissa's jeans during the
autopsy;

  There were numerous cross-matches of fibers, hairs, and paint between
Melissa's body and clothing and Applicant's jacket, master bedroom, and
truck;

  Two of Melissa's hairs that were recovered from Applicant's truck still
contained the anagen root, indicating they had been forcibly removed from
Melissa's head;

  A Luminal test on the seats of Applicant's truck indicated that they had been
wiped down with Armor All, and two empty containers of Armor All wipes
were found in the garbage at Applicant's home;

  When Applicant's good friend, Elyese Ripley, visited him in jail on January
9, 1999, Applicant asked her to lie and say that she had been with him on the
day Melissa disappeared and that they had gone to the Texaco-McDonald's
near Montgomery College;

  Around early May of 1999, Applicant fabricated a purportedly anonymous
exculpatory letter that described the murder with explicit details that were
confirmed by investigators, the medical examiner, and Applicant's own
medical expert, including the facts that Melissa was injured on the left side of
her face, her neck was cut, one of her shoes had fallen off, she was laid among
the bushes on her back, and she was wearing red underwear; (2)

  Later in May of 1999, Applicant was asked by a cell mate whether he had
committed the murder and Applicant replied, "Fuck, yeah, I did it," and stated
that he was just trying to avoid the death penalty.

 


 Two of the most inculpatory pieces of evidence proving that applicant murdered
Melissa on December 8th were: (1) the pieces of potato, chicken, and green vegetable that
Melissa ate for lunch immediately before disappearing that were found in her stomach during
the autopsy on January 3, 1999. Doctor Joye Carter testified at trial that food remains in the
stomach for about two hours after eating it. (2) Cell phone records showing applicant used
his cell phone at 3:03 p.m. on December 8th near the cell phone tower at FM 1097, a
highway that crosses I-45 well north of applicant's trailer house (or the Montgomery County
College). This is directly on a logical path to the Sam Houston National Forest where
Melissa's body was found three weeks later.

 The original affidavits from Dr. Larkin and Dr. White attacked Dr. Carter's trial
testimony that the results of her autopsy were consistent with Melissa having died on
December 8th. (3)

 It was their opinion, then and now, that the pathological evidence indicated that
Melissa could not have been dead until long after December 8th. (4) Strangely, applicant did
not call either of these pathologists to testify at the July 2007 hearing, although their opinions
were known to him three months earlier. Instead, he called Dr. Luis Sanchez, the Medical
Examiner for Harris County who replaced Dr. Carter. Dr. Sanchez testified that he did not
see any evidence of vaginal bruising in the autopsy photos. Dr. Sanchez gave his opinion
that Melissa's body was not in the Sam Houston Forest environment for more than two
weeks, although it was probably somewhere else before that, because the state of
decomposition-especially that of the pancreas- was not sufficiently advanced for having
been on the forest floor for three weeks. The pancreas "normally" autolyzes (5) quite rapidly,
but Dr. Carter had said that she sectioned and examined the pancreas. Similarly, Dr. Sanchez
thought that both the liver and the intestinal system appeared to be less decomposed than is
consistent with the body lying outside for three weeks. When asked, Dr. Sanchez did not
think that it was impossible for Melissa to have been killed on December 8th. He thought
that it was possible (especially because of the remnants of her lunch from December 8th still
present in her stomach) and that clothing would serve as a preventative barrier to some
degree. When the judge asked whether cold temperatures would preserve a body for longer,
Dr. Sanchez said yes: "Low temperatures can delay the process of decomposition." It would
also delay the activity of insects and maggots. Dr. Sanchez concluded by telling the judge
that "the pattern of decomposition in this case is a little bit unusual. It's not what we tend
to see in most of our cases, especially with the mold that she [Dr. Carter] saw all over her
body."

 Dr. James Arends, an entomologist, testified at the July 2007 hearing and stated that
he thought that Melissa could have been murdered on December 8th and then the "body was
stored someplace cold. And the head got warm, or the head increased in temperature, and
at that point in time, did in fact begin to decompose. And once it did, the odors attracted this
particular fly, as well as some of the other flies that were there. And that's why we only see
fly activity in this body at that point in time. And at some point in time, this body was in-at
some later point in time, then transported to where it was eventually discovered out in the
Sam Houston Forest." In sum, Dr. Arends suggested that Melissa's body was "frozen"
before it was taken to the forest.

 The State called an entomologist from Texas A&M, Dr. Jeffrey Tomberlin, who
testified that it is not uncommon for bodies to remain outside, for several days without any
entomological activity, even in warm weather. "It's highly variable." He thought that there
was nothing odd about Melissa's body being deposited in the forest on December 8th, even
though this particular fly colonization did not start until the 18th. Dr. Tomberlin explained
that the specific fly species that began colonizing Melissa's body on December 18th is a
secondary colonizer, (6) which indicates that her body was in an advanced state of
decomposition at that time. He, like Dr. Arends, had a scientific opinion that the cynomyopsis
fly colonization began on Melissa's body on December 18th, but that she could have been
lying on the cold forest floor since December 8th with little entomological activity for a few
days, then initial colonization by some fly species, and secondary colonization by
cynomyopsis beginning on the 18th.

 After the hearing, the trial judge signed extensive findings of fact and conclusions of
law that addressed the entomological evidence, Dr. Sanchez's testimony, and the fact that the
jury had been told at trial of the unidentified DNA found in blood flakes from under
Melissa's fingernails. (7) Based upon the original trial evidence, the affidavits, and testimony
submitted, the trial court concluded that the new evidence was not exculpatory, nor was it
material to applicant's conviction or sentence. It did not undermine confidence in the
verdict. This Court independently reviewed the record, adopted the trial court's findings and
recommendations, and denied applicant's fourth writ application on January 16, 2008.

 In the meantime, applicant had obtained an affidavit from Dr. Carter, signed on
October 31, 2007, (8) an addendum to Dr. Larkin's original report, signed on October 1, 2007, (9)
and another report by Dr. White, signed on December 12, 2007. (10) On the very day that this
Court denied applicant's fourth writ, he filed his fifth writ, once again alleging that his
forensic evidence conclusively demonstrated that applicant did not murder Melissa Trotter,
as well as raising other claims that he had evidence that another person, Robbie Grove, was
a suspect in Melissa's murder. Once again, this Court, in an abundance of caution, remanded
applicant's subsequent writ to the trial court for additional evidence on the "Robbie Grove"
claim, but not on the forensic evidence because that claim had already been rejected in the
prior writ. Once again, the trial court considered affidavits, conducted a live hearing, and
entered extensive findings of fact and conclusions of law rejecting applicant's claims. We 
denied relief on applicant's fifth writ on December 17, 2008.

 Now, just days before applicant's rescheduled execution, he has filed a pro se motion
for a stay based on the same forensic evidence that was submitted with the fifth writ, and
applicant's attorney has filed another writ application with a third affidavit signed by Dr.
White. This time Dr. White states that he has reviewed autopsy sectional slides of cardiac
muscle tissue and nerve tissue as well as samples of lung and fat tissue. He now concludes
that "[i]f these tissues were obtained at autopsy, then the tissues are of an individual that has
been dead no more than two or three days." He states that "the microscopic appearance of
the tissue in this section is entirely incompatible with the body having been left at this
location earlier than 29 or 30 December 1998." 

 So, when did Melissa die? The scientists are all over the board. Theirs is like the
Indian tale of the blind men touching the various parts of the elephant and coming to entirely
different conclusions about the animal. 

 At trial, Dr. Carter testified that her autopsy findings were consistent with Melissa
having been murdered on December 8, 1998, and placed in the cold, dark, dank environment
of the Sam Houston National Forest. She relied, in part, on the level of external
decomposition as is outlined in note 3, supra. She also relied upon the fact that slow-growing fungus was attached to Melissa's back-a fungus that takes at least two weeks to
develop. She relied on the maggot colonies and activity and the mold on Melissa's body. At the hearing on applicant's fourth writ, the expert entomologists-both for the
applicant and the State-agreed that the Cynomyopsis fly colonization began on Melissa's
body on December 18, 1998. Dr. Tomberlin also noted that this specific fly species is a
secondary colonizer that does not "come in" until initial colonization has occurred by other
species and the body is in an advanced state of decomposition. Dr. Tomberlin thought
Melissa had been in the forest since her death on December 8th. Dr. Arends thought that she
had been killed, then kept in a very cold environment- perhaps frozen-and finally transported
to the forest on or about December 18th.

 Dr. Carter, in her 2007 affidavit, stated that, based upon her recent review of her
internal organs findings in her autopsy report, she now thought that Melissa's body more
likely had not been in the forest for more than two weeks, which would be approximately
December 17th or 18th (when the secondary fly colonization began). She states no opinion
about the date of death, only a revision of her opinion on how long the body was in the forest.

 Dr. Sanchez, the current Medical Examiner for Harris County, testified that he didn't
think that Melissa's body had been in the forest environment for more than two weeks,
although her dead body was probably somewhere else before that. He thought that the
pattern of decomposition was "a little bit unusual." 

 Both Dr. Larkin and Dr. White originally thought that Melissa "was dead for far less
than the twenty-five (25) days opined by Dr. Carter." And that "[p]athologists cannot
accurately estimate a post mortem internal with the precision that Dr. Carter indicated she
was capable of." In their subsequent written opinions, these pathologists were capable of
great precision, opining that Melissa did not die until December 29th or 30th, based on their
review of the autopsy report's findings, slides, and photographs of her relatively intact
internal organs and the lack of significant bloating.

 The hallmark of a scientifically sound hypothesis is that it is consistent with, and
accounts for, the totality of the known facts. So let us assume applicant's hypothesis and see
how it accounts for the rest of the facts. If Melissa did not die until December 29th, where
was she and what was she doing from her disappearance from applicant's trailer on
December 8th until 21 days later? Why did she still have the remnants of the lunch she ate
on December 8th in her stomach when she died 21 days later? Why did she leave her
cigarettes and lighter at applicant's trailer? Who took her and what could that person have
done with her for 21 days? Why didn't applicant notice Melissa's sudden disappearance
from his trailer? Why was she still wearing exactly the same clothes when she died on the
29th that she was wearing when she disappeared on the 8th? And, if she was wearing those
clothes for 21 more days, why are they in the same condition that they were in on December
8th?

 Why didn't applicant admit to being with Melissa on the 8th? Why did he not admit
to his two friends, the Fosters, that he had told them the day before Melissa's disappearance
that he was meeting Melissa for lunch on the 8th? Why was applicant driving by the cell
phone tower on FM 1097, located between his trailer in Conroe and the Sam Houston
National Forest, at 3:03 p.m. on December 8th? Why did he lie and say that he was taking
his grandmother to the post office in Conroe-many miles south of FM 1097-at that particular
time? Why was the distinctive missing half of the panty hose with which Melissa was
strangled found in the garbage can behind applicant's trailer? (11)

 Why did Mrs. Swearingen find their trailer house in such disarray when she returned
on the evening of December 8th? Why did applicant have scratches and bruising on his face
that afternoon? And why did applicant then call the police and report a burglary at his trailer
when nothing was missing and then lie to them, saying that he was out of town from 11 a.m.
on December 7th until 7:30 p.m. on the 8th? Why did applicant tell a former girlfriend on
the evening of December 8th that he was in trouble and the police might be after him? Why
were fibers similar to those from Swearingen's jacket, from the rug in his trailer, and from
his truck found on Melissa's body? Why were fibers similar to those from Melissa's jacket
found in applicant's truck? Why was a hair that appeared to have been forcibly torn from
Melissa's head found in applicant's truck? Why were torn papers containing Melissa's class
schedule and health insurance information found scattered in the road in front of the home
of applicant's mother and stepfather on December 17th?

 Why was Melissa's body found in the particular secluded area in the Sam Houston
forest where applicant had previously taken a date? Why did Melissa's body have fungus
on it that takes "several weeks" to develop? Why, if she died just a couple of days before her
body was found, did she have bluish mold all over her body? Why did applicant suddenly
wipe down the interior of his truck with Armor All and leave two empty containers of Armor
All wipes in his garbage?

 Why did applicant ask a good friend, who visited him in jail, to lie and say that she
had been with him on December 8th? And why, when he was in jail, did applicant write a
letter in Spanish, using a Spanish-English dictionary, that purported to come from a person
named "Robin" and send it to his mother? Why was the letter able to set out many of the
details of Melissa's murder, including the facts that (1) she was wearing red panties at the
time she was murdered; (2) the murderer had hit her on the left side of her face (a fact that
Dr. Carter noted in her autopsy report); and (3) one of her shoes came off when he "jerked"
her into the bushes? (12)

 All of this evidence is wildly inconsistent with the hypothesis that Melissa magically
"disapparated" from the earth for twenty-one days and then reappeared, as if from suspended
animation, dead on the floor of the Sam Houston National Forest on December 29th or 30th. 
And why was her supposedly living body infested with "secondary colonization" carrion flies
on December 18th? This is beyond peculiar.

 When all of the other known facts and evidence are wholly inconsistent with a
particular scientific hypothesis, the reasonably objective scientist revisits that original
hypothesis, looking for a flaw. Although one does not doubt the honesty and sincerity of
these medical examiners, their theory that Melissa did not die until December 29th or 30th
because of the relatively intact state of some of her internal organs is flatly contradicted by
an incredible wealth of other evidence. They have made no attempt to account for or explain
this other evidence or provide an alternate hypothesis. 

 One plausible explanation, suggested by Dr. Tomberlin, is that it was much colder and
wetter on the floor of the forest than at the Conroe airport, many miles south, where the
official temperature data was gathered. This is a very shady, damp forest, close to Lake
Conroe, filled with towering pines, covered with decomposing vegetation, and containing
many low-lying cold pockets. Perhaps the cold, dank conditions acted as a drag on the
body's internal decomposition. (13) None of these pathologists expressed any expertise in
climatological impact upon decomposition. Or, as suggested by Dr. Sanchez, the variations
in the decomposition of Melissa's body are simply "quite unusual." But not unheard of. 

 Our "actual innocence" jurisprudence includes the requirement that the newly
discovered evidence (14) of innocence must satisfactorily explain all, or at least the vast
majority, of the original inculpatory evidence. (15) In this case, the pathologists' opinion
concerning the date of Melissa's death is wholly inconsistent with all of the other inculpatory
evidence, and applicant has provided no common-sense context for the uncritical acceptance
of those opinions.

 Texas is one of the very few American jurisdictions that recognizes, in the habeas
corpus context, a free-standing claim of actual innocence. We first crossed over the bridge
of addressing post-conviction claims of actual innocence fifteen years ago in State ex rel.
Holmes v. Court of Appeals for the Third District. (16) And we have not wavered in our basic
commitment to permitting an inmate to prove his innocence while enacting a suitably high
threshold to weed out the frivolous from the potentially meritorious claims. (17) We do this
because 

 we fail in our primary duty of protecting the innocent and punishing the guilty
if we intentionally slam the courthouse doors against one who is, in fact,
innocent of wrongdoing. ...[I]f the criminal justice system-even when its
procedures were fairly followed-reaches a patently inaccurate result which has
caused an innocent person to be wrongly imprisoned for a crime he did not
commit, the judicial system has an obligation to set things straight. Our
criminal justice system makes two promises to its citizens: a fundamentally fair
trial and an accurate result. If either of those two promises are not met, the
criminal justice system itself falls into disrepute and will eventually be
disregarded. (18)


 But in this case, the pathologists' opinion that Melissa did not die until December 29
or 30, 1998, cannot be reconciled with the mountain of inculpatory evidence and therefore
cannot be accepted at face value or as sufficient to unquestionably demonstrate applicant's
actual innocence of Melissa Trotter's murder on December 8, 1998.

 I therefore join the Court's Order.

Filed: January 27, 2009

Do Not Publish

 



1. A pro se application was filed in the trial court on January 23, 2009, and numerous
subsequent claims were filed by applicant's attorneys on January 23, 2009. I address only the
actual innocence claims.
2. This letter is quoted, in full, in the direct appeal of this case. Swearingen v. State, 101
S.W.3d 89, 94-95 (Tex. Crim. App. 2003).
3. Her autopsy report includes the following observations about the level of decomposition
of Melissa's body:


 The body received was that of a young Caucasian female whose facial appearance was
distorted due to decompositional change characterized by skin slipping, greenish-black
discoloration of the facial skin, and marbling of the skin of the legs, arms, chest, and
back. The body was damp due to external weather conditions.
 The body was cool and damp to the touch.
 The scalp hair was slipping due to decompositional change.
 The ocular globes were liquified.
 The facial skin appeared to be removed due to decompositional change and postmortem
insect and animal activity.
 . . . rodent teeth impressions were identified.
 Soft tissue was absent from the nose and midfacial areas.
 The tongue was protruding and dark black in color due to decompositional change.
 The oral cavity contained fly larvae.
 Both ears were markedly discolored due to decompositional change.
 There was a 3 by 2 3/4 inch defect on the anterior neck with liquefaction of tissue,
maggot activity, and blood present. The anterior chest with breasts and the abdominal
contour were remarkable only for decompositional change.
 The upper extremities . . . were remarkable for decompositional change.
 There was marked skin slippage of the skin of the right hand with only the fingernail
remaining on the 2nd digit. The skin of the left hand was intact but was too moist for
fingerprinting.
 The lower extremities were remarkable . . . for decompositional change.
 The posterior surface was remarkable for plant vegetation adherent to the body. [At trial,
Dr. Carter testified that she found slow-growing fungus here, consistent with Melissa's
body having been in the forest for twenty-five days.]
 The anal and vaginal orifices were unremarkable with the exception of decompositional
changes.
 The skin of the body diffusely showed splotchy areas of red, green, and gray discoloration
secondary to postmortem mold growth.
 The heart was intact . . . [but] There was extreme laxity of the consistency due to
decompositional change. 
 The aorta was intact and remarkable for decompositional change.
 Upon sectioning, normal [genitourinary tract] tissue architectural change was obscured
due to decompositional change.
 The internal genitalia were remarkable for mild decomposition change.
 Decompositional changes were noted to the muscosal surface of the stomach. The
remainder of the small and large intestine was intact and displayed mild to moderate
decompositional change characterized by bubbling and transparency of the serosal
surfaces.
 The skin [of the neck] was reflected laterally to reveal markedly decomposed anterior
neck structures.
 [T]he inferior remnant of the larynx was irregular in the midline and there were tiny
notched ridges from postmortem gnawing.
 There were scattered maggots within the neck organs upon dissection.
 There was complete loss of normal tissue architecture upon removing the brain tissue.
 The pituitary gland was markedly autolyzed.
 The ligature imprint [made by cut portions of a panty hose] was poorly discernible due to
the decompositional change of the neck.
 The edges of the severed larynx were irregular due to postmortem animal activity. The
surrounding tissue appeared to be hemorrhagic and dark secondary to postmortem insect
and animal degradation. This was not discernible completely due to decompositional
change.
4. In their first affidavits, the doctors criticized Dr. Carter for testifying that the date of
death was 25 days prior to the recovery of the body. Dr. White stated, "Pathologists cannot
accurately estimate a post mortem interval with the precision that Dr. Carter indicated she was
capable of. Pathological estimates of the time of death, using the type of evidence on which Dr.
Carter relied, cannot be made with confidence after a body has been left unprotected for far less
time than 25 days. A pathologist could only estimate a relatively broad range of weeks or even
months during which Ms. Trotter died." Both Dr. White and Dr. Larkin are pathologists
themselves.

 Both doctors reviewed Dr. Carter's autopsy report, looked at some of the autopsy and
crime scene photos, and were familiar with Dr. Sanchez's criticism of Dr. Carter's finding of
vaginal bruising. Most importantly, they concluded that the pancreas liquefies almost entirely
within a day or so of death, sometimes within hours, therefore either Dr. Carter's finding that the
pancreas was intact was wrong or her testimony about the date of death was wrong. Dr. Larkin
agreed that Melissa's "body was in the liquefaction phase, but not far into it," and that Dr.
Carter's report on the weight of Melissa's organs show the "absence of significant shrinkage due
to dehydration, autolysis and subsequent drainage strongly indicates a date of death well after
December 11, 1998."

 Neither doctor mentioned that what appeared to be the remnants of Melissa's lunch on
December 8th were still in her stomach or how that finding might affect their opinion on the
death date.
5. Dr. Sanchez explained that, when an organ autolyzes, "it's the breakdown of the tissues
due to their own, again, enzymes and chemicals. It's not due to bacteria. It's due to the
breakdown of those cells that are releasing enzymes that basically break down the tissues."
6. Dr. Tomberlin explained:

 When we talk about decomposition of human remains as we relate it to
insect succession, if you look at the most comprehensive studies that have been
published on the colonization of human remains, primarily we're [talking] about
obtaining 65 through 68. What you find is that there is a series of species that will
come in. There are those that are initial colonizers. Once those have come in,
then you will have secondary colonizers. When you have the secondary
colonizers, which is Cynomyopsis in this case, it's considered an advanced stage
of decomposition.
7. The trial judge's findings relevant to the blood flakes are as follows:


 The evidence at trial showed that, subsequent to the first test performed on the fingernail
scrapings obtained during the autopsy, which revealed no human DNA present, some
"very tiny, bright red flakes" were observed in a alter inspection.
 Based on the credible testimony of DPS criminologist Carrie Carradine, the flakes had a
total size "no bigger than . . . a point of a pencil" and "tested positive for the presumptive
test for blood."
 Based on Ms. Carradine's credible testimony, DNA typing of the sample produced a
profile that was consistent with a male, but not Applicant.
 Based on the credible testimony of Dr. Carter and Ms. Carradine, the small, red blood
flakes discovered during the second examination of the fingernail scrapings were both
visibly and structurally too well-preserved to have been exposed to the elements for more
than a couple of hours or days at most, and appeared consistent with a recent
contamination.
 The unidentified male DNA profile obtained from the blood flakes was run through
CODIS, and also compared to at least six different men at Applicant's request prior to
trial, with no match resulting.
 The evidence of the unidentified male DNA profile was presented to the jurors at trial,
who proceeded to return a guilty verdict.
8. In her affidavit, Dr. Carter stated that her opinion at trial that her autopsy findings were
consistent with Melissa being murdered on December 8, 1998, was based primarily upon "the
external appearance of the body, including marked decomposition of the head and neck region,
and on the degree of maggot activity in this region of the body. I also remarked on the presence
of fungal growth, noting that these organisms thrive in dark, dank and wet environments and are
slow growing." 

 Now that she had reviewed the temperature data for Conroe during the appropriate time
period (the temperature was that registered at the Conroe airport, about twenty miles south of 
where Melissa was found in the middle of the Sam Houston National Forest), she discovered that
the average temperature was 50 degrees, with an average high of about 62 degrees and an average
low of 40 degrees. Dr. Carter now noted that decomposition was strikingly uneven with "partial
skeletonization of the head and neck region due to decomposition and insect and mammalian
scavenging." But the amount of decomposition of internal organs "appears less advanced." She
thought that if the temperature was approximately 50 degrees and the high occasionally as high
as the mid-70's, Melissa's body could not have been exposed in the forest until some time after
December 12th. "These internal findings support a forensic opinion that the body had not been
exposed more than two weeks in the forest environment." 
9. Dr. Larkin, in his addendum, opines that "December 23, [1998] is the soonest that
Trotter's body could have been left in the woods" and that he thought that the evidence most
likely suggested a date as late as December 30, 1998. He also stated that even if the temperatures
in the forest were five degrees or more colder than at the Conroe airport, the forensic evidence
would still strongly support the dates of December 23rd as an outer limit and December 30th as a
very likely date because "the pancreas would not have been present in the condition described by
Dr. Carter unless exposure in the Sam Houston forest occurred after December 28 or December
29, 1998." He also said that the liver and spleen would not have been intact had Melissa been in
the forest since December 8th, and her body weight would have been much less than 105 (her
regular weight was 109 shortly before her death) because it would have lost 90% of its weight
during that time. 
10. In this report, Dr. White agreed with Dr. Carter's affidavit and her re-evaluation of her
autopsy report and trial testimony. He concurred that her "internal examination of the body
support[s] the forensic conclusion that Melissa Trotter's body was left in the woods within
fourteen days of the discovery of the body on January 2, 1999[.]" He also agreed with Dr. Larkin
that Dr. Carter's description of the internal organs "indicate that the body was left in the woods at
on or about December 23, 1998, at the soonest, and probably left there no sooner than December
27 or 28, 1999." 
11. Applicant now requests that DNA testing be done on the half of the pantyhose that was
around Melissa's neck in case there was some one else's DNA on that panty hose. One would
naturally assume that there would be: the DNA of the owner of the pantyhose. Melissa was not
wearing pantyhose that day. But because the other half was found outside applicant's trailer, the
hose might well have belonged to Mrs. Swearingen, who was not at home on the afternoon of
December 8th. Her DNA might well be on both sections of the pantyhose. And, of course, one
might find the DNA of various people who handled Melissa's body or handled the other section
of pantyhose found in the garbage can.
12. When Melissa's body was found, she had one shoe on and the other was lying nearby.
13. Dr. Carter's autopsy report notes, in three different places, how "cool and damp"
Melissa's body was. She stated:

 * The body was damp due to external weather conditions.

 * The body was cool and damp to the touch.

 * The skin of the left hand was intact but was too moist for fingerprinting.

Drs. Larkin and White relied, in part, upon the fact that Melissa's body had lost very little of its
normal weight-going from 109 to 105 pounds-but it is common knowledge that the body is
composed of between 50-75% water, at the lower end for obese people, higher for thin people
like Melissa. A dead body loses water by evaporation. It would not be unusual to think that a
body lying in cold, damp-perhaps intermittently wet depending upon rainfall-conditions would
lose significantly less water due to evaporation than one lying in a dry, open area with blowing
wind acting as a natural evaporator. I am unable to find anything in the record that indicates that
the pathologists consulted 1998 rainfall charts for the Sam Houston National Forest or that they
took into account the generally high humidity levels in forests of this type.
14. Of course, the State is technically correct that the pathological evidence concerning
Melissa's body is not "newly discovered" in legal terms because it was always available once Dr.
Carter completed her autopsy on January 3, 1999, and could have been brought forward at trial
had applicant exercised due diligence. 
15. See Ex parte Brown, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006) (in assessing "actual
innocence" claims, the trial judge "assesses the witnesses' credibility, examines the 'newly
discovered evidence,' and determines whether that 'new' evidence, when balanced against the
'old' inculpatory evidence, unquestionably establishes the applicant's innocence."); Ex parte
Elizondo, 947 S.W.2d 202, 206 (Tex. Crim. App. 1994) ("in evaluating a habeas claim that
newly discovered or available evidence proves the applicant to be innocent of the crime for
which he was convicted, our task is to assess the probable impact of the newly available evidence
upon the persuasiveness of the State's case as a whole, we must necessarily weigh such
exculpatory evidence against the evidence of guilt adduced at trial."); see also Ex parte
Thompson, 153 S.W.3d 416, 428 (Tex. Crim. App. 2005) (Cochran, J., concurring) ("Before an
applicant could meet this [actual innocence] legal standard, he must show that the 'new'
evidence satisfactorily rebuts or nullifies all of the State's primary inculpatory evidence from the
'old' trial.").
16. 885 S.W.2d 389 (Tex. Crim. App. 1994).
17. See, e.g., Ex parte Elizondo, 947 S.W.2d at 202; Ex parte Franklin, 72 S.W.3d 671
(Tex. Crim. App. 2002); Ex parte Tuley, 109 S.W.3d 388 (Tex. Crim. App. 2002); Ex parte
Harmon, 116 S.W.3d 778 (Tex. Crim. App. 2003); Ex parte Thompson, 153 S.W.3d at 416.
18. Ex parte Thompson, 153 S.W.3d at 421 (Cochran, J., concurring).